UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

BAWER AKSAL,

               Petitioner,

    v.

UNITED STATES OF AMERICA,

               Respondents.

Civil Action No. 16-2776 (JLL)

OPINION

**LINARES**, District Judge:

Presently before the Court is the motion of Bawer Aksal ("Petitioner") to vacate, set aside, or correct his sentence brought pursuant to 28 U.S.C. § 2255. (ECF No. 1). The Government has filed a response to the motion (ECF No. 6), to which Petitioner has filed a reply. (ECF No. 9). For the following reasons, this Court will grant Petitioner a hearing only as to his plea related ineffective assistance claim, but will deny all of Petitioner's remaining claims and deny Petitioner a certificate of appealability as to his non-plea claims.

## I. BACKGROUND

As the Third Circuit explained in its opinion affirming Petitioner's conviction and sentence on direct appeal, Petitioner, Bawer Aksal

> was convicted [in this Court] of having sexually assaulted a woman on a commercial airplane in flight. The victim, who used the pseudonym "Susan Thomas" throughout the trial, was a stranger to [Petitioner]. She fell asleep on the cross-country flight seated in the window seat next to [Petitioner] who sat in the middle seat. As she slept, [Petitioner] touched her breasts and used his fingers to penetrate her vagina and anus. [Petitioner] was convicted of two criminal counts for this conduct . . . (1) knowingly engaging in a sexual act with Thomas while knowing her to be incapable of

1

> appraising the nature of the conduct, or physically incapable of declining participation in that sexual act, or incapable of communicating her unwillingness to engage in the sexual conduct in violation of 18 U.S.C. § 2242(2) and 49 U.S.C. § 46506; and (2) knowingly engaging in sexual contact with Thomas without Thomas's permission, and with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person in violation of 18 U.S.C. § 2244(b) and 49 U.S.C. § 46506. [Petitioner] was sentenced to 97 months imprisonment [as a result].

*United States v. Aksal*, 638 F. App'x 136, 139 (3d Cir. 2015).

Shortly before Petitioner's trial was set to begin, the parties appeared before this Court for a hearing on June 20, 2013, following the apparent collapse of a preliminary plea agreement. (Document 2 attached to ECF No. 6). At the start of that hearing, the Government informed the Court that, as the parties were preparing for trial, the Government offered a plea agreement to Petitioner on or about June 13 or 14, 2013. (*Id.* at 4). Petitioner, after speaking with counsel, apparently was initially willing to agree to the proposed offer. (*Id.*). The Government provided a first copy of that agreement to Petitioner's attorney on June 18, 2013, which apparently matched the informal agreement to which the parties would have agreed. (*Id.* at 4-6; *see also* Document 1 attached to ECF No. 6). On June 19, the Government, however, forwarded to defense counsel an amended written agreement. (Document 1 attached to ECF No. 6 at 13). The sole apparent change was that the amended agreement contained the following language – "[the Government] will take no position as to the sentence to be imposed upon [Petitioner] and leaves such determination entirely to the Court's discretion." (*Id.*). While the previously offered agreement did not contain this language, neither did it contain any language to the contrary. (*Id.* at 4). At 4:19 p.m. on June 19, the Government received an e-mail stating that defendant had rejected the amended plea. (*Id.*; Document 3 attached to ECF No. 6 at 2). In that e-mail, Petitioner's counsel's associate explained to the Government that either Petitioner "didn't understand what was [previously] agreed . . . or

2

he now changed his mind, but [Petitioner refused to] sign off on the plea agreement (it's most likely the latter). . . . [His] main issue with the plea agreement seems to be a factual basis [requiring him] to admit to any contact that is sexual in nature." (Document 3 attached to ECF No. 6 at 3). Defense counsel's associate, however, expressed hope that Petitioner would again change his mind before the scheduled hearing the following day.  Approximately an hour later, at 5:18 p.m., the Government replied with an e-mail in which it formally withdrew the plea agreement.  (*Id.* at 4).

Based on this factual background, the Government requested that the Court engage in a colloquy with counsel and Petitioner to forestall any later ineffective assistance of counsel claim based on the withdrawn plea agreement. (Document 2 attached to ECF No. 6 at 4-5).  During that colloquy, Petitioner's trial counsel, Robert Degroot, explained that after he received the amended plea agreement on June 19, he sent his associate, Oleg Nekritin to explain the amended agreement to Petitioner within half an hour of receiving it because Petitioner's pre-trial release order prevented him from coming to Degroot's office without a court order and Degroot could not go to Petitioner himself.  (*Id.* at 7).  Counsel further stated that, that afternoon, he received a call from Nekritin in which Nekritin told him Petitioner had rejected the agreement not because of the substance of the agreement but instead because of "how the [factual] alloc[u]tion would have to be made."  (*Id.*).  Degroot further stated that he spoke with Petitioner again that night, and Petitioner told him he had rejected the deal.  (*Id.*).  Upon questioning by the Court, Degroot confirmed that, during his previous discussions with Petitioner, he had had a full opportunity to discuss the proposed agreement, had answered all of Petitioner's questions about the proposed agreement, and had explained to Petitioner "the advantages and disadvantages of accepting or rejecting" the plea agreement, and that the agreement they had discussed differed from the rejected

3

agreement only in that the amended agreement contained the language stating that the Government would take no position as to sentencing. (*Id.* at 7-8).

This Court then questioned Netirkin. Netirkin agreed that he had gone to explain the amended agreement to Petitioner on the afternoon of the June 19, that Netirkin had had a sufficient opportunity to explain the agreement to Petitioner and had answered all of Petitioner's questions in that regard. (*Id.* at 10). Moreover, Netirkin stated that he had explained to Petitioner the advantages and disadvantages of taking or rejecting the plea. (*Id.*). Both Netirkin and Degroot both stated that they had also both told Petitioner that the decision as to whether to accept the plea offer was Petitioner's alone to make. (*Id.* at 10-11). Netirkin then confirmed that Petitioner personally told him he was rejecting the plea offer at about 3:15 p.m. on June 19, and Degroot further stated that Petitioner reached a final decision to reject the agreement within a half hour of that initial rejection. (*Id.* at 11).

This Court then discussed the matter with Petitioner himself. Petitioner stated that he received the proposed agreement and understood that the decision to reject or accept a plea was his alone to make. (*Id.* at 12). Additionally, Petitioner noted that, after the amended agreement was received, Netirkin came to discuss it with him that afternoon. (*Id.*). Petitioner claimed, however, that there was a "misunderstanding" between himself and Netirkin and Petitioner told Netirkin and Degroot that he would not accept the plea deal because of this alleged language barrier issue between himself and Netirkin.[1] (*Id.* at 13). Petitioner stated, however, that that night he

---

[1] The Government insisted at that hearing that there had never been any language barrier between Netirkin and Petitioner. (*Id.* at 15). While there is nothing in the record other than Petitioner's assertion to suggest that there was a language barrier between the two as both appeared capable of speaking and understanding English during appearances before this Court, there is also nothing in the record setting forth exactly what was discussed between the two, or what language was used at that time, and Netirkin did not provide any testimony or information about any lingual problems that may or may not have existed, although his statements suggest that Netirkin believed that

called and texted Degroot and told him that he had changed his mind, and that he wished to take the agreement now that he understood its terms and had had a chance to discuss the amended agreement with Degroot. (*Id.*). Petitioner advised that this conversation apparently took place at between five and six o'clock that evening. (*Id.*). However, Degroot asserted that he did not speak to or hear from Petitioner until "a little later" than the six o'clock suggested by petitioner, and that Petitioner did not tell him he had changed his mind and wished to plead guilty until shortly before 9 a.m. on June 20 (*see id.* at 18), and that Degroot called the Government immediately thereafter, but the Government had confirmed its statement in the e-mail and told Degroot that the deal was "off the table." (*Id.* at 14, 18). Degroot also reiterated that Petitioner's original rejection had come about because Petitioner couldn't accept the plea allocution required by the agreement. (*Id.*).

Having conducted this hearing and determined that no guilty plea was to be entered, this matter proceeded to trial in July 2013. The victim, under the pseudonym Susan Thomas, was the first to testify at trial. Thomas testified that she was a heavy sleeper who often had a "hard time" getting up after sleeping, and that she had only had limited sleep during the days preceeding the flight on which she and Petitioner travelled from Arizona to New Jersey. (Docket No. 12-577 at ECF no. 81 at 50-56). She then testified that, on August 20, 2012, she boarded a flight travelling from Arizona to New Jersey at approximately 4:30, and sat in her seat, which was a window seat labeled 24F. (*Id.* at 67, 73-74). Two other individuals were then seated in her row, a thin man, Evan Focht, who sat in the aisle seat (24D), and Petitioner, who was seated between Thomas and Foct in seat 24E. (*Id.* at 74-75). Thomas, after reaching her seat, then texted a friend about the fact that Petitioner was encroaching on her space and touching her leg and arm, but made no

---

Petitioner understood him. Trial testimony from a federal agent, however, did suggest that Petitioner had no language barrier issues when giving his statement in this matter in English. (*See* Docket No. 12-577 at ECF No. 84 at 152).

comment to him because she was uncertain if he was doing so on purpose. (*Id.* at 78-79). Thomas, hoping to sleep during the flight, after watching at least part of the in-flight movie ultimately turned away from Petitioner as best she could, leaned against the window, and went to sleep without speaking to Petitioner other than to ask him to move when she was getting to her seat. (*Id.* at 93-96). When she went to sleep, Thomas had a jacket draped over her lap. (*Id.* at 96).

Thomas testified that the next thing she remembered after awakening was feeling as if something was around her neck. (*Id.* at 98). As she came awoke, Thomas realized that Petitioner had coiled around her, with one hand under her shirt and over her breast, with the other inside of her shorts. (*Id.*). Thomas further testified that she felt choked up as she realized that Petitioner had used his fingers and thumb to penetrate her vagina and anus. (*Id.*). Thereafter, Thomas stated that she "jerked away" from him, but he pressed against her back and asked her to kiss him, at which point she pushed him away and told him to get off of her. (*Id.* at 99). After getting control of herself following this incident, Thomas noticed that Focht, who was sitting in the aisle seat, motioned for her to get up as he had apparently seen what had occurred, at which point she collected her jacket and went to the rear of the plane. (*Id.* at 99-102, 113). Both Thomas and Focht then spoke with the flight attendants, and Thomas told them what had occurred. (*Id.* at 113-14). After the plane landed, Thomas spoke with the authorities, and was ultimately taken to the hospital where she was examined by medical staff. (*Id.* at 125-26).

Following her testimony regarding the events which took place on the plane, Thomas was asked about whether she had discussed the matter with any civil attorneys. Thomas stated that, in the fall of 2012, her boyfriend pushed her to see several attorneys, which she did. (*Id.* at 139-40). Furthermore, Thomas testified that she did not hire the lawyers because she "didn't want to go through" a civil suit. (*Id.* at 140). Thomas was also cross examined on the possibility of a civil

6

suit, but once again confirmed that she had not, as of that point, hired a lawyer or sought to raise a claim against the airline. (Docket No. 12-577 at ECF No. 82 at 114).

Evan Focht, the man seated in the aisle seat on the plane, also testified at trial. (*Id.* at 125). Focht confirmed that he had been in the aisle seat, Petitioner in the center, and Thomas in the window seat on the August 20, 2012, flight. (*Id.* at 127). He further testified that he did not remember any conversation between himself, Petitioner, or Thomas prior to takeoff. (*Id.* at 129-30). He also testified that he noticed that Thomas fell asleep soon after takeoff. (*Id.* at 131). Next, Focht stated that, after the movie and some in flight shows had aired, Petitioner asked him to turn off his reading light, which he did as he believed Petitioner intended to nap until landing. (*Id.* at 131-32). About twenty minutes later, Focht turned to his right and saw Petitioner "spooned up next to" Thomas, with no space between them and Petitioner's right arm over her shoulder and his left hand beneath her jacket by her lap. (*Id.* at 132-34). Focht stated that the apparent intimacy of this position surprised him as there had been no indication before that point that Petitioner and Thomas were anything but strangers. (*Id.* at 135). As Focht was puzzling over the situation, he saw Thomas wake up suddenly and jerk away, followed by her slamming down an arm rest between Petitioner and herself as she pulled away from him before starting to hyperventilate. (*Id.*). Thereafter, Focht stated that as Thomas seemed to hyperventilate, Petitioner pretended to go to sleep, at which point he waited for Thomas to look in his direction and invited her to get up and leave the seating row. (*Id.* at 136-37). Focht also stated that he then accompanied her to the rear of the plane, where they spoke with the flight attendants about what had happened. (*Id.* at 139-40).

Several other witnesses, including flight attendants and the nurse who conducted the rape examination of Thomas also testified at trial, giving testimony which in all important respects was

7

consistent with the testimony of Thomas and Focht. *See United States v. Aksal*, No. 12-577, 2013 WL 6633086, at *1-4 (D.N.J. Dec. 17, 2013). The jury also heard testimony from law enforcement personnel who provided the jury with testimony as to the statement Petitioner had given to them in which he admitted to having sexual contact with Thomas, but insisted that Thomas herself had initiated that contact by pressing his hand into her genitals, at which point he pulled his hand away. (*See* Docket No. 12-577 at ECF No. 83 at 160-64).

Following the conclusion of testimony, the parties gave their closing statements. During the Government's initial statement, the Government responded to Petitioner's suggestion during questioning that Thomas had testified in this matter in preparation for a civil suit as follows:

> [Petitioner] also suggested to you that [Thomas] and all of the [numerous other] witnesses might not be trustworthy, because [Thomas] went to go see two attorneys. You heard from Ms. Thomas why she went to go see those attorneys, and she never left her name and she never retained any of them, and she does not want anybody to know that this ever happened to her. In her words, she didn't want to be pitied. She doesn't want the humiliation.

(Docket No. 12-577 at ECF No. 85 at 76).

In response, Petitioner's defense attorney presented the following argument in his own summation:

> Now, [as to] the lawyers, if you were the victim of a tort, and a tort is a civil wrong, for which you may recover damages, you have a right to pursue it, but you people as the jurors have a right to look at it, and you have a right to look at whether or not Ms. Thomas went to lawyers. Is there a motivation, because if there is a conviction here, her position against the airlines certainly is enormously better than if there isn't a conviction, so I suggest to you that there is some motive to be disingenuine.

(*Id.* at 106).

The Government in turn responded to that argument in rebuttal:

[Defense counsel] said [Thomas] has a motive to be disingenuous. He never said [that she] lied, just different words, disingenuous. She saw lawyers.

Imagine that.

So she was hyperventilating, jerking awake. Her chain is broke[n]. Her bra is down. She is thinking dollar signs.

Really?

By the way, is there anything wrong with going to a lawyer after an incident like this and seeing what her legal rights are?

I submit to you there is not, but she chose not to. She is not suing the airline. She's not suing anyone. But [defense counsel] uses that in his mosaic as a reason why you should not believe Susan Thomas.

If Ms. Thomas was so good in . . . all of her [actions] that everyone said they saw, she has fooled two flight attendants with a combined 36 years of experience, she fooled two FBI agents, a Port Authority cop, a sexual assault nurse, and everybody else.

But you saw her, and it is your decision. She wasn't here to fool you. She wasn't here in a roomful of strangers because she thought it was fun[,] for dollar signs, [or] because she is being disingenuous. She came here and told a roomful of strangers with a packed courtroom about intimate parts of her body.

Why would she make that up?

Why would she do this?

My colleague said, all she's had is grief over this. She doesn't want to be identified. She wants this to be over.

So you ask yourself why she would put herself through that.

. . . .

So finally, I am going to end on this. I want you to think about Ms. Thomas and what it took for her to testify in a roomful of strangers, a packed courtroom, and describe the humiliation she felt, the helplessness as she was gathering herself after the attack, and

> how she had to come here and recount the intimate details of the
> sexual assault, the rape kit examination, and the impact that it had
> on her life. Ask yourselves why she would put herself through this.
>
> It's not for money. It's certainly not to have her background
> examined and poked over by [defense counsel]. It is not to keep
> from having to answer embarrassing questions. I mean, she
> obviously felt, and she told you that she felt victimized by going
> through the system. It did not have anything to do with getting a
> benefit for her son or dollar signs from going to a lawyer's office.
>
> She came here for one very simple reason, to seek justice.

(*Id.* at 120-21, 127).

Following summations, the jury found Petitioner guilty of both counts of the indictment on

July 19, 2013, and this Court sentenced Petitioner to 97 months' imprisonment on January 29,

2014. *Aksal*, 638 F. App'x at 139. Petitioner appealed, and the Third Circuit affirmed. *Id.* More

than a year after the jury returned its guilty verdict, and several months after Petitioner's

sentencing, Ms. Thomas apparently filed a law suit against United Airlines arising out of this

incident, captioned *Jane Doe v. United Airlines*, Docket L-5327-14, in the Superior Court of New

Jersey, Essex County. In his habeas petition, Petitioner asserts that this lawsuit resulted in a

settlement for an unspecified amount. Petitioner thereafter filed his current habeas petition in May

2016. (ECF No. 1).

## II. DISCUSSION

### A. Legal Standard

A prisoner in federal custody may file a motion pursuant to 28 U.S.C. § 2255 challenging

the validity of his or her sentence. Section 2255 provides, in relevant part, as follows:

> A prisoner in custody under sentence of a court established by Act
> of Congress claiming the right to be released upon the ground that
> the sentence was imposed in violation of the Constitution or laws of

10

> the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255. Unless the moving party claims a jurisdictional defect or a constitutional violation, to be entitled to relief the moving party must show that an error of law or fact constitutes "a fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair procedure." *United States v. Horsley*, 599 F.2d 1265, 1268 (3d Cir. 1979) (quoting *Hill v. United States*, 368 U.S. 424, 429 (1962)), *cert. denied* 444 U.S. 865 (1979); *see also Morelli v. United States*, 285 F. Supp. 2d 454, 458-59 (D.N.J. 2003).

**B. Petitioner shall receive a hearing solely as to his plea-related claim**

28 U.S.C. § 2255(b) requires an evidentiary hearing for all motions brought pursuant to the statute "unless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *United States v. Booth,* 432 F.3d 542, 545 (3d Cir. 2005); *United States v. Day*, 969 F.2d 39, 41-42 (3d Cir. 1992). "Where the record, supplemented by the trial judge's personal knowledge, conclusively negates the factual predicates asserted by the petitioner or indicate[s] that petitioner is not entitled to relief as a matter of law, no hearing is required." *Judge v. United States*, 119 F. Supp. 3d 270, 280 (D.N.J. 2015); *see also Government of Virgin Islands v. Nicholas*, 759 F.2d 1073, 1075 (3d Cir. 1985); *see also United States v. Tuyen Quang Pham*, 587 F. App'x 6, 8 (3d Cir. 2014); *Booth*, 432 F.3d at 546. For the reasons set forth below, this Court will grant Petitioner a hearing solely as to his claim that counsel was ineffective

in advising him in regards to a proposed plea deal from the Government, but will deny all of his remaining claims without a hearing as they are clearly without merit.

## C. Petitioner's Ineffective Assistance of Counsel Claims

In his motion, Petitioner first raises two claims in which he asserts that his trial counsel was constitutionally ineffective both in advising him as to a proposed plea offer and during trial when counsel did not object to the jury charge. The standard which governs such claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687*; see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.
>
> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.
>
> Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate

that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge*, 119 F. Supp. 3d at 280-81.

**1. Petitioner's Plea Deal Claim**

In his chief claim, Petitioner contends that his attorneys were constitutionally ineffective in failing to advise him to accept the proposed amended plea agreement before that agreement was withdrawn by the Government. As the Third Circuit has explained,

> The [Supreme] Court has []emphasized that "[d]efendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process." *Lafler v. Cooper*, --- U.S. ---, 132 S.Ct. 1376, 1384[] (2012).
>
> When addressing a guilty plea, counsel is required to give a defendant enough information "'to make a reasonably informed decision whether to accept a plea offer.'" *Shotts v. Wetzel*, 724 F.3d 364, 376 (3d Cir. 2013) (quoting *United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992)), *cert. denied*, --- U.S. ---, 134 S.Ct. 1340[] (2014). We have identified potential sentencing exposure as an important factor in the decisionmaking process, stating that "[k]nowledge of the comparative sentence exposure between standing trial and

accepting a plea offer will often be crucial to the decision whether
to plead guilty." *Day*, 969 F.2d at 43.

*United States v. Bui*, 795 F.3d 363, 366-67 (3d Cir. 2015).

Even if a petitioner can show that his counsel failed to give him adequate advice in regards
to a proposed plea agreement, the Petitioner must show that he was prejudiced by that failure in
order to make out an ineffective assistance claim.  This requires a petitioner to show that "there is
a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding
would have been different . . . [which i]n the context of pleas [requires] a [petitioner] show the
outcome of the plea process would have been different with competent advice." *Lafler v. Cooper*,
--- U.S. ---, ---, 132 S. Ct. 1376, 1384-85 (2012).  A petitioner makes out such a claim where he
shows that he would have accepted the proposed plea agreement absent counsel's failings in
advising him, that the deal in question was offered and would not have been withdrawn by the
Government, and that the sentence received pursuant to the offered plea would ultimately have
been less severe than the result of his trial. *Id.* at 1385.

In his motion to vacate, Petitioner contends that his attorneys were ineffective in advising
him as to the proposed amended plea agreement insomuch as they did not clearly recommend that
he take the plea. (*See* ECF No. 1 at 31).  Petitioner further contends that, had he been advised that
taking the plea was in his best interests, he would have accepted it and would have received a
lesser sentence than that received after trial.[2]  Although this Court held a hearing on the plea issue,

---

[2] Although Petitioner contends that the plea would have resulted in a sentence of time served,
nothing in the proposed plea agreement would have guaranteed such a result.  Because the
maximum sentence Petitioner could have received under the plea, however, would have been 18
months in prison, it is clear that had he accepted the plea, he would have received a less harsh
sentence than that he ultimately received.  Given this fact, and the fact that the deal itself was not
withdrawn until *after* Petitioner rejected the deal in initial conversations with Netirkin is likely that
Petitioner can establish *Strickland* prejudice, although his ability to establish deficient performance
remains in doubt absent a hearing.

14

because of the procedural stage of Petitioner's criminal matter at that time, the transcript of that hearing is devoid of information as to what was actually discussed between Petitioner and Netirkin before Petitioner told Netirkin he wished to reject the plea, and contains no information as to what Netirkin or Degroot specifically recommended, other than the statement by both counsel that they explained to Petitioner the risks and consequences of accepting or rejecting the proposed amended plea offer.

While the record does contain the e-mails which clearly suggest that Petitioner's issue with the plea was with the required factual basis, specifically that he would need to admit to sexually assaulting Thomas in order to plead guilty, Petitioner's testimony at the pre-trial hearing also suggests that part of the reason for his rejection was some misunderstanding between himself and Netirkin as to the terms and changes in the plea agreement. Although the e-mail and the statements by counsel that Petitioner had issues with the factual allocution portion of the plea certainly undercut his current claim insomuch as they suggest that he was unwilling to plead to the crime required by the proposed plea agreement because he was unwilling to admit to sexually assaulting Thomas, the record is silent as to whether this issue with the factual basis would have persisted in the face of a recommendation that Petitioner take the proposed amended plea.[3] Thus, in the absence of clear testimony regarding what recommendations were made to Petitioner or a clear credibility determination rejecting Petitioner's assertions of misunderstandings or language barriers, which is likely not possible on the record before the Court, Petitioner's claim cannot be resolved solely on the current record. Therefore, while the record suggests that counsel may well

---

[3] The statements by both attorneys at the pre-trial hearing on the plea certainly suggest that both counsel likely recommended that Petitioner take the plea deal, which, if true, would severely undermine Petitioner's claim, but neither counsel specifically asserted this to be the case at that limited hearing.

have recommended the plea deal, and may also suggest that Petitioner would not have accepted the deal regardless because of his disinterest in admitting to sexual assault, this Court will, in an abundance of caution, order a hearing on Petitioner's ineffective assistance of counsel claim related to the advice he received as to the proposed amended plea agreement.

### 2. Petitioner's Jury Charge Claim

In his second claim of ineffective assistance of counsel, Petitioner asserts that trial counsel proved constitutionally ineffective when he failed to object to the portion of the jury charge in this case in which this Court informed the jury that if it determined the victim was sleeping beyond a reasonable doubt at the time Petitioner had sexual contact with her, that the Government had met its burden in proving that the victim was incapable of providing consent to such contact. Although now framed as an ineffective assistance of counsel claim, Petitioner raised a similar direct claim, that this instruction denied him his right to Due Process, on direct appeal. *See Aksal*, 638 F. App'x at 140-41. In disposing of that claim, the Third Circuit explicitly determined that the alleged jury charge error could not have affected the outcome of Petitioner's trial and sentence both because the evidence at trial showing that Petitioner's victim was incapable of giving consent was "compelling" and because the "jury was properly instructed on count two (knowingly engaging in sexual contact with the victim without the victim's permission), and, in reaching a guilty verdict on that count, the jury determined that [the victim] did not give her consent for the sexual contact." *Id.* at 141. Thus, the Third Circuit has already determined that the allegedly faulty instruction, and in turn counsel's failure to object that instruction, did not affect the outcome of Petitioner's trial. As Petitioner cannot therefore show that "there is a reasonable probability . . . that the result [of Petitioner's trial] would have been different" absent counsel's failure to object to the challenged

instructions, Petitioner cannot establish that he suffered prejudice as a result of this alleged failing. *Strickland*, 466 U.S. at 694. Petitioner's jury charge related ineffective assistance claim is therefore without merit, and must be denied.

## D. Petitioner's Perjury Related Due Process Claim

In his final claim, Petitioner contends that he is entitled to a new trial because Thomas's subsequent lawsuit against the airline indicates that she committed perjury in testifying that she had no intention of filing suit at trial, and that the Government in turn knowingly made use of that perjury to convict Petitioner.[4] In order to be entitled to relief in a § 2255 motion in a claim based on a witness's alleged perjury, a habeas petitioner must show that the Government's use of that perjury violated his fundamental right to a fair trial. *See United States v. Biberfeld*, 957 F.2d 98, 102 (3d Cir. 1992). To make such a showing, the petitioner must show that the prosecutor in his case used testimony that the prosecution knew or should have known was perjury, either by

---

[4] In its response the Government contends that this argument is procedurally defaulted because it was not initially raised in a motion for a new trial under Rule 33. Petitioner contends in his reply brief that his perjury claim indicates that he is actually innocent of the crimes with which he was charged, which is sufficient to overcome his procedural default. Because Petitioner's claim, to the extent it is not defaulted, is patently without merit, this Court will deny that claim on the merits regardless of any procedural default, and will address neither the default claim or Petitioner's actual innocence gateway claim further save to note that Petitioner has utterly failed to show his actual innocence for the reasons set forth below as to why he has failed to show a Due Process violation based on alleged perjury and has therefore not made out actual innocence sufficient to entitle him to use his innocence as a gateway through his alleged procedural default nor to use actual innocence as a stand-alone claim for relief. *See, e.g., McQuiggan v. Perkins*, --- U.S. ---, ---, 133 S. Ct. 1924, 1934-46 (2013) (actual innocence gateway claim requires a petitioner affirmatively show that "no reasonable juror would have convicted him" in light of newly raised, reliable evidence); *Herrera v. Collins*, 506 U.S. 390, 400-417 (1993) (actual innocence normally acts only as a gateway claim for piercing a procedural default and is not a stand-alone claim, even if a stand-alone claim of innocence were viable in habeas, such a claim would require an even greater showing of innocence than a gateway claim); *Albrecht v. Horn*, 485 F.3d 103, 126 (3d Cir. 2007); *Hubbard v. Pinchak*, 378 F.3d 333, 339-50 (3d Cir. 2004).

soliciting the false testimony itself or allowing known false testimony to go uncorrected at trial. *Id.*; *see also United States v. Jones*, 832 F. Supp. 2d 519, 534 (E.D. Pa. 2011).

In this matter, Petitioner contends that the fact that Thomas filed suit against the airline well after his trial had ended indicates that her testimony at trial that she had no interest in filing suit was false, the prosecutor "knew" that information to be false, and this falsehood proves that Petitioner was innocent. Petitioner's claim, however, is based on nothing more than his own speculation that Thomas had always planned to file suit, and that her trial testimony was nothing more than an attempt to prepare the way for her civil suit. This speculation provides him no basis for relief. First, the Court notes that there is nothing in the record to suggest that any of the testimony that Thomas gave at trial was false, and the decision to file suit following trial in no way indicates that she had any intention of doing so at the time she testified. It simply does not follow from her filing suit that she did anything other than change her mind. Nothing Petitioner provides indicates that it is even more likely than not that Thomas had any intention of filing suit when she testified. As such, there is no basis for concluding that her testimony was perjurious, and there is certainly no basis on which this Court could conclude that the Government knew or had any reason to know that this testimony regarding Thomas's future legal intentions amounted to perjury. As such, Petitioner patently cannot show that his Due Process rights were violated by the challenged testimony.

In his motion and in reply, Petitioner contends that his claim that Thomas's entire testimony amounted to perjury was supported by the "fact" that DNA evidence "proved" that she was lying. This contention is also patently false. The only testimony regarding DNA at trial established that no conclusive DNA evidence had been recovered in this matter, a fact which neither proves nor disproves the veracity of Thomas's testimony. Contrary to Petitioner's assertions in his motion,

18

Thomas was not the "only" witness whose testimony led to his conviction. The credibility of Thomas's testimony, and the reliability of Petitioner's conviction, are both strongly supported by the testimony of Focht, which corroborated Thomas's version of the events at trial, as well as the testimony of other witnesses at trial indicating that Thomas told flight attendants, federal agents, and a sexual assault nurse essentially the same story she gave on the stand. Thomas's testimony was also corroborated by physical evidence submitted at trial, including her damaged clothing which supported the contention that Petitioner had forcibly removed Thomas's bra during the events on the plane. Petitioner's contention that Thomas fabricated the entire story, and that her decision to file suit against the airline *after Petitioner's trial* indicates that she committed perjury, is completely without support in the record, and what evidence is contained in the record instead strongly suggests that Thomas's testimony was true. There is no evidence that Thomas committed perjury, no evidence that the Government knew of any such perjury if she did, and thus no evidence which would support a finding of a Due Process violation on these facts, and Petitioner's claim is therefore without merit. *Biberfeld*, 957 F.2d at 102.

In a footnote in support of his perjury claim, Petitioner also contends that the Government's summation comments on Thomas's testimony also amount to improper vouching, a claim which was not raised on direct appeal nor through any other mechanism previously, although Petitioner could have done so. This claim, to the extent a lone footnote in Petitioner's original brief and another in his reply brief can be said to raise a claim, is therefore defaulted. Petitioner's procedural default notwithstanding, Petitioner's briefly alleged vouching claim is similarly without merit. A prosecutor in a criminal matter improperly vouches for a witness when he assures the jury of that witness's credibility on the basis of his personal knowledge or some other information outside of the trial record. *Judge*, 119 F. Supp. 3d at 288. As the Third Circuit has explained,

A prosecutor's vouching for the credibility of a government witness raises two concerns: (1) such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and (2) the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

. . . .

Our case law indicates that to find vouching two criteria must be met: (1) the prosecutor must assure the jury that the testimony of a Government witness is credible; and (2) this assurance is based on either the prosecutor's personal knowledge or other information not contained in the record. Thus, it is not enough for a defendant . . . to assert that the prosecutor assured the jury that a witness' testimony was credible. The defendant must be able to identify as the basis for that comment an explicit or implicit reference to either the personal knowledge of the prosecuting attorney or information not contained in the record. It follows that where a prosecutor argues that a witness is being truthful based on the testimony given at trial, and does not assure the jury that the credibility of the witness based on his own personal knowledge, the prosecutor is engaging in proper argument and is not vouching. Likewise, prosecutorial comment that points to a lack of evidence in the record which supports a defendant's argument that the witness is not credible is proper so long as the comment does not constitute an assurance by the prosecutor that the witness is credible.

*United States v. Walker*, 155 F.3d 180, 184, 187 (3d Cir. 1998); *see also United States v. Lore*, 430 F.3d 190, 211-12 (3d Cir. 2005); *Judge*, 119 F. Supp. 3d at 288.

In this matter, neither of the prosecuting attorneys committed improper vouching during either the summation or rebuttal. Viewed in the context of the trial, and closing arguments, it is clear that both prosecuting attorneys addressed an issue raised by Petitioner's counsel both during Thomas's testimony and during his own closing argument – Thomas's credibility based on her having communicated with lawyers regarding a potential civil suit and Petitioner's contention that

a civil suit gave her a motive to lie and create allegations of sexual assault out of whole cloth, based entirely on the evidence in the record.

Neither prosecutor raised either his or her own knowledge or any other basis outside of the facts evinced at trial in support of their arguments that Thomas was credible, and instead both used the testimony at trial, alongside the patent absurdity of the claim that Thomas created her claim of sexual assault solely for the purpose of a later civil suit, to make their argument. These arguments were entirely fair, meant to deflate Petitioner's counsel's questioning on cross examination, and both to preclude and rebut the argument Petitioner made suggesting that Thomas had a pecuniary motive to lie insomuch as she could later bring suit against the airline. As both of the arguments Petitioner challenges as "vouching" were based only on the testimony at trial and basic logic, and as neither prosecutor assured the jury Thomas was credible based either on their own personal knowledge or facts outside the trial record. No improper vouching took place, and Petitioner's assertion of vouching is without merit. Petitioner is thus not entitled to relief on that basis.

## III. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c) the petitioner in a § 2255 proceeding may not appeal from the final order in that proceeding unless he makes "a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). For the reasons expressed above, all of Petitioner's non-plea related claims are patently without merit and thus are not "adequate to deserve encouragement to proceed further." As such, and because jurists of reason would not

disagree with this Court's resolution of Petitioner's non-plea claims, Petitioner is denied a certificate of appealability as to his non-plea claims.

## IV. CONCLUSION

For the reasons set forth above, this Court will GRANT Petitioner a hearing as to his plea related ineffective assistance claim, but will DENY all of Petitioner's other claims and will DENY Petitioner a certificate of appealability as to his non-plea claims.  An appropriate order follows.

_____

Hon. Jose L. Linares,
United States District Judge