UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

BAWER AKSAL,

Petitioner,

v.

UNITED STATES OF AMERICA,

Respondents.

Civil Action No. 16-2776 (JLL)

OPINION

**LINARES**, Chief District Judge:

Presently before the Court is Petition Bawer Aksal's motion to vacate, set aside, or correct his sentence brought pursuant to 28 U.S.C. § 2255. (ECF No. 1). Following this Court's decision denying all but one of Petitioner's claims (ECF Nos. 10-11), this Court held a hearing on Petitioner's sole remaining claim. (*See* ECF No. 23). Petitioner thereafter filed a brief in support of his claim (ECF No. 27), to which the Government has responded. (ECF No. 28). For the following reasons, Petitioner's sole remaining claim is denied, and Petitioner is denied a certificate of appealability.

**I. BACKGROUND**

As this Court has previously set forth the background of Petitioner's conviction in detail in its prior opinion, the Court will only recount here those facts related to Petitioner's sole remaining claim – that he received ineffective assistance of counsel in relation to a proposed plea deal prior to trial, resulting in his loss of the benefit of that plea deal. As this Court previously recounted,

> Shortly before Petitioner's trial was set to begin, the parties appeared before this Court for a hearing on June 20, 2013, following the apparent collapse of a preliminary plea agreement. (Document

1

2 attached to ECF No. 6). At the start of that hearing, the Government informed the Court that, as the parties were preparing for trial, the Government offered a plea agreement to Petitioner on or about June 13 or 14, 2013. (*Id.* at 4). Petitioner, after speaking with counsel, apparently was initially willing to agree to the proposed offer. (*Id.*). The Government provided a first copy of that agreement to Petitioner's attorney on June 18, 2013, which apparently matched the informal agreement to which the parties would have agreed. (*Id.* at 4-6; *see also* Document 1 attached to ECF No. 6). On June 19, the Government, however, forwarded to defense counsel an amended written agreement. (Document 1 attached to ECF No. 6 at 13). The sole apparent change was that the amended agreement contained the following language – "[the Government] will take no position as to the sentence to be imposed upon [Petitioner] and leaves such determination entirely to the Court's discretion." (*Id.*). While the previously offered agreement did not contain this language, neither did it contain any language to the contrary. (*Id.* at 4). At 4:19 p.m. on June 19, the Government received an e-mail stating that defendant had rejected the amended plea. (*Id.*; Document 3 attached to ECF No. 6 at 2). In that e-mail, Petitioner's counsel's associate explained to the Government that either Petitioner "didn't understand what was [previously] agreed . . . or he now changed his mind, but [Petitioner refused to] sign off on the plea agreement (it's most likely the latter). . . . [His] main issue with the plea agreement seems to be a factual basis [requiring him] to admit to any contact that is sexual in nature." (Document 3 attached to ECF No. 6 at 3). Defense counsel's associate, however, expressed hope that Petitioner would again change his mind before the scheduled hearing the following day. Approximately an hour later, at 5:18 p.m., the Government replied with an e-mail in which it formally withdrew the plea agreement. (*Id.* at 4).

Based on this factual background, the Government requested that the Court engage in a colloquy with counsel and Petitioner to forestall any later ineffective assistance of counsel claim based on the withdrawn plea agreement. (Document 2 attached to ECF No. 6 at 4-5). During that colloquy, Petitioner's trial counsel, Robert Degroot, explained that after he received the amended plea agreement on June 19, he sent his associate, Oleg Nekritin to explain the amended agreement to Petitioner within half an hour of receiving it because Petitioner's pre-trial release order prevented him from coming to Degroot's office without a court order and Degroot could not go to Petitioner himself. (*Id.* at 7). Counsel further stated that, that afternoon, he received a call from Nekritin in which Nekritin told him Petitioner had rejected the agreement not because of the substance of the agreement but instead because of "how the [factual]

alloc[u]tion would have to be made." (*Id.*). Degroot further stated that he spoke with Petitioner again that night, and Petitioner told him he had rejected the deal. (*Id.*). Upon questioning by the Court, Degroot confirmed that, during his previous discussions with Petitioner, he had had a full opportunity to discuss the proposed agreement, had answered all of Petitioner's questions about the proposed agreement, and had explained to Petitioner "the advantages and disadvantages of accepting or rejecting" the plea agreement, and that the agreement they had discussed differed from the rejected agreement only in that the amended agreement contained the language stating that the Government would take no position as to sentencing. (*Id.* at 7-8).

This Court then questioned Nekritin. Nekritin agreed that he had gone to explain the amended agreement to Petitioner on the afternoon of the June 19, that Nekritin had had a sufficient opportunity to explain the agreement to Petitioner and had answered all of Petitioner's questions in that regard. (*Id.* at 10). Nekritin also stated that he had explained to Petitioner the advantages and disadvantages of taking or rejecting the plea. (*Id.*). Both Nekritin and DeGroot both stated that they had also both told Petitioner that the decision as to whether to take the plea was Petitioner's alone to make. (*Id.* at 10-11). Nekritin then confirmed that Petitioner told him he was rejecting the deal personally at about 3:15 p.m. on June 19, and DeGroot further stated that Petitioner reached a final decision to reject the agreement within a half hour of that initial rejection. (*Id.* at 11).

This Court then discussed the matter with Petitioner himself. Petitioner stated that he received the proposed agreement and understood that the decision to reject or accept a plea was his alone to make. (*Id.* at 12). Petitioner also stated that, after the amended agreement was received, Nekritin came to discuss it with him that afternoon. (*Id.*). Petitioner claimed, however, that there was a "misunderstanding" between himself and Nekritin and Petitioner told Nekritin and DeGroot that he wouldn't accept the plea deal because of this alleged language barrier issue between himself and Nekritin[.] (*Id.* at 13). Petitioner stated, however, that that night he called and texted DeGroot and told him that he had changed his mind, and that he wished to take the agreement now that he understood its terms and had had a chance to discuss the amended agreement with DeGroot. (*Id.*). Petitioner stated that this conversation apparently took place at between five and six o'clock that evening. (*Id.*). DeGroot, however, stated that he did not speak to or hear from Petitioner until "a little later" than the six o'clock suggested by petitioner, and that Petitioner did not tell him he had

3

> changed his mind and wished to plead guilty until shortly before 9 a.m. on June 20 (*see id.* at 18), and that DeGroot called the Government immediately thereafter, but the Government had confirmed its statement in the e-mail and told DeGroot that the deal was "off the table." (*Id.* at 14, 18). DeGroot also reiterated that Petitioner's original rejection had come about because Petitioner couldn't accept the plea allocution required by the agreement. (*Id.*).

(ECF No. 10 at 2-5).

As to the language barrier issue, Petitioner specifically testified at the pre-trial hearing as follows:

> THE COURT: Did you, in fact, receive a proposed plea agreement through your attorney from the Government, dated June 18, 2013?
>
> [Petitioner]: Yes, I did, your Honor.
>
> THE COURT: At that time did you have first an opportunity to discuss it with Mr. DeGroot and then also an opportunity to discuss it with Mr. [Nekritin]?
>
> [Petitioner]: Yes. Mr. [Nekritin] came to my apartment in the afternoon, and we discussed the situation.
>
> THE COURT: Okay. Did you also discuss it prior to Mr. [Nekritin] coming to your apartment, did you also discuss it with Mr. DeGroot?
>
> [Petitioner]: Mr. DeGroot told me that a proposal –
>
> [DeGroot]: Just say yes or no.
>
> [Petitioner]: Yes.
>
> THE COURT: You do understand, sir, right, that it is exclusively, and that means only, your decision whether or not to accept or reject the plea, that is a decision, however, that should be made after consultation with your attorney, and is that what you did in this case?
>
> [Petitioner]: Yes. After I spoke to [Nekritin], I had to call back to Mr. DeGroot that I am accepting the plea deal because there was some language . . .
>
> THE COURT: That you were accepting or rejecting it?

4

> [Petitioner]: No. When [Nekritin] came to my apartment at the beginning, because there were some changes, what we discussed with Mr. DeGroot the first time, and then after there was changes, but I wasn't aware of those changes. When [Nekritin] came to my apartment and explained it to me, I was kind of hesitant because I wasn't told ahead of time.
>
> And then Mr. [Nekritin] left my apartment, I called Mr. DeGroot, and I said I wouldn't accept the plea deal because there was some language – there was a misunderstanding between me and [Nekritin due to] language.
>
> THE COURT: So after you spoke to [Nekritin], you then spoke to Mr. DeGroot, right?
>
> [Petitioner]: Yes.
>
> THE COURT: And did you clear up the misunderstanding at that point?
>
> [Petitioner]: Yes. I told Mr. DeGroot –
>
> THE COURT: Wait, wait. And did you have at that time an opportunity to ask questions of Mr. DeGroot about the plea agreement and make a decision on your own after you had talked to him.
>
> [Petitioner]: Exactly. I told Mr. DeGroot, I texted him, I said there was misunderstanding, a language barrier between me and [Nekritin], and I am accepting . . . the plea deal, I will do it. Then I texted Mr. DeGroot.

(Document 2 attached to ECF No. 6 at 10-13).

Based on this background material and Petitioner's allegations in his § 2255 motion that counsel had misadvised him leading to his rejection of the offered plea deal, this Court granted Petitioner a hearing limited solely to his plea-related ineffective assistance claim on March 13, 2017. (ECF Nos. 10-11). Following limited discovery, the Court held that hearing on October 25, 2017. (*See* ECF No. 23, 26). At the hearing, Petitioner, DeGroot, and Nekritin all testified

5

regarding the events which ultimately led to Petitioner's loss of the offered plea deal. (ECF No. 26).

At the hearing, Nekritin and DeGroot testified in a fashion largely consistent with the information they provided during the pre-trial hearing. Nekritin, who testified first, explained that he had been an associate of DeGroot's at the time of Petitioner's trial who had been involved in preparing Petitioner for trial and in advising Petitioner in relation to his plea. (ECF No. 26 at 9). Nekritin testified that, on or about June 17, 2013, Petitioner met with him and DeGroot and discussed the potential for a plea deal. (*Id.* at 11). Although there was no final, written plea deal at that time, Nekritin testified that they believed the Government was open to a resolution of Petitioner's case through a plea deal which would involve little, if any, jail time, and would not result in Petitioner having to register as a sex offender, although no written plea had yet been offered. (*Id.* at 12-14). At that time, Petitioner was willing to take a plea, even though he had been advised that he might have to make a factual allocution including admissions of sexual conduct that he did not want to make. (*Id.* at 17-18).

Nekritin then testified regarding the Government's plea offer in the form of the two plea agreements discussed above. (*Id.* at 19-21). According to Nekritin, Petitioner did not receive a copy of the initial plea proposed by the Government, and instead first saw the amended plea agreement of June 19 when Nekritin brought the amended plea deal and factual basis to Petitioner's home on June 19, although Petitioner may have previously discussed the initial plea agreement. (*Id.* at 20-22). On June 19, Nekritin went to see Petitioner with the amended plea agreement, arriving at approximately 2:50 p.m., and leaving Petitioner's home approximately one-half hour later, although Nekritin briefly called him after he left. (*Id.* at 31-34). Nekritin informed the Court that, during that half hour meeting, he reviewed the amended plea agreement with Petitioner,

discussed with Petitioner the differing sentencing exposures he would face if he accepted the plea or went to trial – with the plea having a maximum sentence of eighteen months but a likely sentence of little-to-no jail time and trial having a potential top sentence between eight and twelve years, and told Petitioner that if he failed to take the plea it could be withdrawn. (*Id.* at 15, 46-47, 51-53). Nekritin further testified that, although he may not have gone through every sentence of the plea deal, that they discussed the "relevant paragraphs," including the sentencing provisions, the factual basis for a plea, and the stipulations in the agreement. (*Id.* at 49). Nekritin also stated that, after discussing the agreement, he recommended that Petitioner take the agreement as he considered the deal "a grand slam." (*Id.* at 54). According to Nekritin, Petitioner understood him during these discussions, and there was no language barrier between them that he perceived. (*Id.* at 68).

Nekritin then recounted that when Petitioner was told that he would have to admit to having sexually touched the victim on the breast, he chose to reject the deal as he was unwilling to make that admission. (*Id.* at 55). Although Nekritin attempted to persuade Petitioner that the deal was worth taking, Petitioner was apparently adamant that he would not make this admission, and that the factual basis became an insurmountable obstacle to his taking the plea deal. (*Id.* at 56-58). After Petitioner refused the deal, Nekritin called DeGroot, and was advised that he could do no more than recommend the deal, and that if Petitioner would not take it, it was Petitioner's decision to make. (*Id.* at 56-57). Although Nekritin believed Petitioner would ultimately change his mind, because the Government had told him they needed an answer on the 19th, he contacted the Government and informed them Petitioner was not willing to take the deal at that time. Thereafter, the Government withdrew the plea offer via e-mail at 5:18 p.m. (*Id.* at 38, 58-60).

In his testimony, DeGroot testified in a fashion essentially consistent with Nekritin's testimony. DeGroot testified that he met with Petition on the 17th, that he explained the comparative sentencing exposure under a likely plea with a potential sentence of between no jail time and eighteen months, and trial, which carried a likely sentence of roughly eight to nine years. (*Id.* at 77-78), and strongly recommended that Petitioner take a plea deal. (*Id.* at 79). DeGroot also testified that, when they received the final plea agreement, he sent Nekritin to see Petitioner with the deal, and did not hear back until Nekritin called him and told him that Petitioner "would not admit" to touching the victim and was thus unwilling to take the offered plea. (*Id.* at 81). DeGroot explained that, at the time, he thought Petitioner would be "out of his mind" to turn down the deal, and told Nekritin that he could and should recommend the deal, but the decision would have to be left to Petitioner at the end of the day, and that Nekritin should not try to force Petitioner into taking the deal. (*Id.* at 83-84).

When Petitioner ultimately refused the deal, DeGroot instructed Nekritin to respond to the Government and tell them he had rejected the deal, so that the Government could not claim that they had failed to respond in time. (*Id.* at 85). DeGroot further stated that he did not hear from Petitioner again until several hours after the Government withdrew the deal, at approximately 8:00 p.m. when Petitioner called him and told him he now wanted the deal. (*Id.*). Even after Petitioner changed his mind, however, Petitioner still wanted to plead guilty "focused on assault, not sexual contact." (*Id.* at 90). DeGroot testified that he then tried in vain to see if the deal could be resurrected, which ultimately led to the pre-trial hearing the following day. (*Id.* at 89). On cross-examination, DeGroot also testified that, prior to receiving the amended plea deal, he had discussed the initial plea deal with Petitioner, discussed the advantages and disadvantages of pleading guilty, and strongly recommended that Petitioner take the deal. (*Id.* at 92). DeGroot also testified on

8

cross-examination that Petitioner was educated and able to understand himself and Mr. Nekritin, and that he had expected no issues with Petitioner signing the agreement when he sent Nekritin to him as the amended agreement was not substantially different from that they had discussed on the phone the day before. (*Id.* at 92-96, 98).

During his testimony during the § 2255 hearing, Petitioner testified to a version of events both contrary to his two trial attorneys, and at least partially different from that provided at the pre-trial hearing. Petitioner testified that, during the June 17th meeting, he was told that he would have to plead to having touched the victim's breasts, and would receive a conviction carrying a potential 18 month sentence which would probably result in no jail time, but that no mention of sentencing following trial occurred. (*Id.* at 102). Petitioner also asserted that no mention was made of "advantages or disadvantages of going to trial." (*Id.*). Petitioner asserted that he wanted to plead guilty at that time, but that DeGroot and Nekritin were interested in going to trial and wanted him to pay them more money to pursue his trial. (*Id.* at 102-03). According to Petitioner, he would have taken a no jail time deal, provided he would have been able to travel afterward to see his daughter and other family abroad. (*Id.* at 102-05).

According to Petitioner, Nekritin came to see him on June 19th, but only stayed for fifteen to twenty minutes, during which he showed him two pages – less than were in the amended plea agreement. (*Id.* at 105). Petitioner testified that Nekritin told him at that time that the change in the plea agreements was that Petitioner would have to admit to sexually touching the victim not only on her breasts, but also on her genitals,[1] and that the judge would now decide his sentence and would give him a sentence of additional jail time. (*Id.* at 106). Despite this, Petitioner stated that he wanted to take the deal, but Nekritin refused to let him take the plea deal at that time and

---

[1] The amended plea agreement contained a stipulation that Petitioner had touched the victim's breast, but did not mention any contact with her genitals. (Document 1 attached to ECF No. 6 at 17).

9

instead told him he would get a better deal or return to Petitioner, without making mention of the fact that the deal could be withdrawn. (*Id.* at 106-08).

Petitioner further stated that he then spoke with a friend who was a lawyer, who encouraged him to follow his instincts and take the deal as Nekritin had "misinformed" him. (*Id.* at 109). Petitioner noted that he Nekritin never explained the full deal, and only briefly discussed the two pages he brought, some of which involved some legal terms such as "quid pro quo"[2] that he didn't understand. Petitioner further testified that he called and texted Nekritin and DeGroot several times[3] telling them he wished to take the deal. (*Id.* at 110-12). Petitioner also testified that he spoke with DeGroot on the 20th, at which time DeGroot again told him he didn't recommend the deal, and that a better deal could be obtained or that a victory at trial was likely. (*Id.* at 115-16). Petitioner stated that he continued to insist he wanted the deal, and DeGroot relented angrily and told him to come to court, at which point the hearing occurred and he learned the deal had been withdrawn. (*Id.* at 116-17).

On cross-examination, the Government questioned Petitioner regarding his testimony during the pre-trial hearing, noting that Petitioner at that time had testified that he had rejected the deal based on a language barrier, resulting in the following testimony:

> [The Government:] Do you remember testifying that, in fact, the reason that a plea did not result on the day prior during your meeting with Mr. Nekritin was because the[re was a] language barrier between [Petitioner] and [Nekritin]?
>
> [Petitioner]: As I testified, I am a college graduate person, yes, but it comes a time, I mean, I was never – I never committed a crime in 25 years in America, and I was never involved in a lawsuit. I mean

---

[2] While Nekritin may have used this phrase in discussing the amended plea agreement with Petitioner, that phrase does not appear to have been used in the plea agreement. (*See* Document 1 attached to ECF No. 6 at 12-17).
[3] At the hearing, Petitioner presented a copy of a text message stating he wished to take the deal that he sent to DeGroot's office phone, which was apparently incapable of receiving text messages, which was sent at 7:58 p.m., nearly three hours after the deal had been withdrawn. (ECF No. 26 at 113-14).

[The Government]: But the question is: on June 20th, you stated under oath that the reason for the misunderstanding was a language barrier. Today, is it your testimony, that there was some kind of a language problem between you conveying I want the plea, and [Nekritin] saying, I don't want you to sign it?

[Petitioner]: Well, I mean, there was some language barrier. As I told you, quid pro quo, I didn't know what quid pro quo means. I don't know what amendment means. There were a couple of other vocabularies that I do not understand. I mean, just because I am a college graduate doesn't mean that I understand every law. I am not a lawyer. So what I did, I called John Cannel. He explained to me in plain English [what was in the deal.]

[The Government then confronted Petitioner with his testimony at the *Frye* hearing and his testimony at that time that he was "hesitant" to accept the deal because he wasn't told about changes ahead of time. The Government also pointed out that, in the text message entered into evidence, Petitioner tried to text DeGroot at about 8 p.m. that he "misunderstood what [Nekritin] told [him and would now] take the deal."]

[The Government]: Why were you texting that you didn't understand, and that's why you weren't taking the deal? Why would you say that in this text message when you say today that you wanted the deal the whole time?

[Petitioner]: Well, maybe I used the English wrong. English is my third language. I mean, maybe I . . . misused [] the sentence. What I mean by that I misunderstood what [Nekritin] told me was because [he] did not . . . explain to me the truth about the plea deal, what was in the plea deal.

. . . .

[The Government]: But, Mr. Aksal, you already testified that you wanted the deal as it was presented to you.

[Petitioner]: Yes, because [Nekritin] then called me and say that the deal is off the table. The prosecutors have withdrawn [the deal.]

[The Government]: You testified earlier that during the three o'clock meeting with [Nekritin], you wanted the deal then?

[Petitioner]: Yes.

11

[The Government]: Yet, at eight o'clock you're sending a text message again to create a record, as you testified earlier, that you misunderstood [Nekritin] and now wanted to take the deal?

[Petitioner]: Exactly. That is what I meant by it, that [Nekritin] did not explain to me correctly. That is what I meant.

[The Government then confronted Petitioner with the language barrier testimony again, specifically noting that, at the *Frye* hearing, Petitioner stated that he "called Mr. DeGroot, and . . . said [he] wouldn't accept the plea deal because there was[a language barrier]."]

[The Government]: Why would you say that?

[Petitioner]: As I said, there was some vocabularies that I didn't understand, that [Nekritin] did not go through the plea deal with me correctly, and that is the reason why I said that.

. . . .

[The Government]: When you met with [Nekritin] at your apartment . . . were you willing to take the plea agreement that was presented to you?

[Petitioner]: Yes, I was willing to take it. If [Nekritin] had presented what —

[The Government]: Not "if." On that date, as presented, were you willing to take the plea deal?

[Petitioner]: Yes. I was going to take the plea deal.

[The Government]: Then why would you testify under oath the very next morning "And then when Mr. [Nekritin] left my apartment, I called Mr. DeGroot, and I said I wouldn't accept the plea deal"?

[Petitioner] The way I made the sentence, because [Nekritin] did not go through everything with me of the plea deal, the advantages and disadvantages of the plea deal.

(*Id*. at 142-147).

## II. DISCUSSION

### A. Legal Standard

A prisoner in federal custody may file a motion pursuant to 28 U.S.C. § 2255 challenging the validity of his or her sentence. Section 2255 provides, in relevant part, as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255. Unless the moving party claims a jurisdictional defect or a constitutional violation, to be entitled to relief the moving party must show that an error of law or fact constitutes "a fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair procedure." *United States v. Horsley*, 599 F.2d 1265, 1268 (3d Cir. 1979) (quoting *Hill v. United States*, 368 U.S. 424, 429 (1962)), *cert. denied* 444 U.S. 865 (1979); *see also Morelli v. United States*, 285 F. Supp. 2d 454, 458-59 (D.N.J. 2003).

### B. Credibility Findings

Having held an evidentiary hearing in this matter and having had the opportunity to observe the demeanor and testimony of the witnesses at that hearing, this Court makes the following credibility determinations. This Court finds the testimony of Mr. Nekritin and Mr. DeGroot to be credible. Although the passage of time understandably had some effect upon their memories, both attorneys testified in a fashion consistent with one another, the documentary evidence including the plea agreements offered in this matter, and, importantly, the testimony produced at the pre-trial

*Frye* hearing. Both attorneys were responsive to questioning during both direct and cross-examination, and appeared forthright in their responses. Having examined their demeanor at both the *Frye* hearing and the § 2255 hearing, and having compared that testimony both to this Court's recollection of this matter and the requisite documentary evidence, this Court therefore finds the testimony of both Nekritin and DeGroot highly credible.

Turning to Petitioner, this Court finds Petitioner's testimony at the § 2255 hearing less credible. Although Petitioner was responsive and agreeable during direct examination, his demeanor on cross-examination became argumentative, especially when counsel questioned him regarding his testimony in the pre-trial hearing. More importantly, Petitioner's testimony at the § 2255 hearing differed markedly from that he provided during the pre-trial *Frye* hearing. While Petitioner testified pre-trial that he rejected the plea agreement because of a language barrier between he and Nekritin which caused him to misunderstand the plea deal, Petitioner at the § 2255 hearing instead testified that he never wanted to reject the agreement and instead consistently and repeatedly stated his desire to take the deal over the objection of counsel, while his attorneys refused to let him accept it and instead recommended he go to trial or seek a better deal, apparently in an effort to charge Petitioner for further services. In light of these inconsistencies, and the Court having had the opportunity to observe Petitioner's manner and demeanor throughout his testimony at the § 2255 hearing, this Court finds Petitioner's testimony lacking in credibility.

### C. Petitioner's Ineffective Assistance of Plea Counsel Claim

In his sole remaining claim, Petitioner alleges that his trial counsel proved ineffective in advising him in regards to the offered plea agreement, resulting in the plea being withdrawn and

Petitioner ultimately receiving a sentence significantly more severe than that he would have received under the plea. As the Third Circuit has explained,

> The [Supreme] Court has []emphasized that "[d]efendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process." *Lafler v. Cooper*, --- U.S. ---, 132 S.Ct. 1376, 1384[] (2012).
>
> When addressing a guilty plea, counsel is required to give a defendant enough information "'to make a reasonably informed decision whether to accept a plea offer.'" *Shotts v. Wetzel*, 724 F.3d 364, 376 (3d Cir. 2013) (quoting *United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992)), *cert. denied*, --- U.S. ---, 134 S.Ct. 1340[] (2014). We have identified potential sentencing exposure as an important factor in the decisionmaking process, stating that "[k]nowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty." *Day*, 969 F.2d at 43.

*United States v. Bui*, 795 F.3d 363, 366-67 (3d Cir. 2015).

Where a petitioner can show that counsel failed to adequately advise him as to a proposed plea agreement, he will still not be entitled to relief unless he can show that he was prejudiced by that failing. This requires a petitioner to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different . . . [which i]n the context of pleas [requires] a [petitioner] show the outcome of the plea process would have been different with competent advice." *Lafler v. Cooper*, --- U.S. ---, ---, 132 S. Ct. 1376, 1384-85 (2012). A petitioner makes out such a claim where he shows that he would have accepted the proposed plea agreement absent counsel's deficient advice, that the deal in question would not have been withdrawn by the Government, and that the sentence received pursuant to the offered plea would have been less severe than the result of his trial. *Id.* at 1385.

Petitioner contends that his counsel were ineffective in failing to advise him to take the offered plea, and that he lost the benefit of that plea as a result. Having considered the testimony

at the hearing, and in light of the credibility findings expressed above, this Court finds that Petitioner has failed to make a showing that he suffered ineffective assistance of counsel. The credible testimony of Petitioner's trial attorneys and the testimony at the pre-trial hearing indicate that Petitioner's attorneys brought him the proposed deal, advised him to take it, and explained to him the advantages of the plea over proceeding to trial – specifically that he faced a significantly shorter sentence if he took the plea. Despite this advice, Petitioner refused the deal over counsel's strong recommendation to take the deal, apparently because he was unwilling to admit to the factual basis for the plea. Petitioner's refusal – and not any deficient performance on the part of counsel – resulted in the plea offer being withdrawn and Petitioner being forced to proceed to trial. Given the Court's credibility findings and the testimony at both the § 2255 hearing and the pre-trial hearing, the Court finds that Petitioner has failed to show that counsel's performance was deficient, and his remaining ineffective assistance claim must therefore fail.

In any event, Petitioner has also failed to show that he was prejudiced by the advice he received based on the testimony at the hearing. As this Court rejects Petitioner's contention that he wished to take the deal prior to its withdrawal as incredible, and as this Court credits counsel's testimony that Petitioner was unwilling to take the deal prior to its withdrawal, it is clear that Petitioner cannot show that the offered plea deal still would have been available at the time he decided he wished to take the deal, which is fatal to his ability to show *Strickland* prejudice under these circumstances. *See Lafler*, 132 S. Ct. at 1384-85. The record of this matter, along with the credible testimony of counsel, indicates that Petitioner chose to reject the plea deal because he was unwilling to accept the factual basis for the plea, that counsel communicated that clear rejection of the deal to the Government as required by the timeline set by the Government, and the Government withdrew the plea. It was only later that Petitioner changed his mind, apparently realizing his

error, but by then the plea had already been withdrawn. Petitioner's text message to trial counsel's office phone three hours after the withdrawal of the plea provides no support for his contention that he always wished to take the plea, and instead appears to be nothing more than the attempt of Petitioner to create a record after he realized he had cost himself a favorable plea agreement. Ultimately, because the credible testimony at the hearing indicates both that Petitioner was given adequate advice and that Petitioner was unwilling to accept the plea offer until after the agreement had been withdrawn, Petitioner can neither show deficient performance by trial counsel or that he was prejudiced, and his ineffective assistance of plea counsel claim is therefore without merit. Petitioner's motion must therefore be denied.

### III. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c) the petitioner in a § 2255 proceeding may not appeal from the final order in that proceeding unless he makes "a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). For the reasons expressed above, Petitioner's sole remaining claim is clearly without merit, and jurists of reasons would not disagree that Petitioner's claims are inadequate to deserve encouragement to proceed further. Petitioner is therefore denied a certificate of appealability.

## IV. CONCLUSION

For the reasons set forth above, Petitioner's sole remaining claim is DENIED and Petitioner is DENIED a certificate of appealability. An appropriate order follows.

JOSE L. LINARES,
Chief Judge, United States District Court